134 So.2d 829 (1961)
TRUMBULL CHEVROLET SALES CO. Inc., a corporation, Appellant,
v.
Robert B. SEAWRIGHT, Appellee.
No. C-321.
District Court of Appeal of Florida. First District.
November 2, 1961.
Rehearing Denied December 7, 1961.
*831 W.A. Swann, Jr., Pensacola, for appellant.
Richard P. Warfield, Pensacola, for appellee.
STURGIS, Judge.
The appellant, Trumbull Chevrolet Sales Co., Inc., a Michigan corporation with its place of business at Detroit, Michigan, hereinafter referred to as "Trumbull", brought a suit in replevin against Robert E. Seawright, the appellee, to recover possession of a Chevrolet automobile allegedly owned by it, and by this appeal seeks reversal of a summary final judgment in favor of Seawright that is predicated exclusively on a "Stipulation of Facts" filed by the parties. It follows that this court, as was the court below, is concerned only with the questions of law applicable to those facts, which must therefore be related in substantial detail.
The automobile was delivered to Seawright in Florida pursuant to a conditional sales agreement which he made with Florida Motor Company of Pensacola, a copartnership engaged in the used car business at Pensacola, Florida. That concern obtained possession pursuant to a purported purchase from one Boots Garner, d/b/a O.K. Motor Company of Dresden, Tennessee, who obtained possession thereof from Trumbull, a franchised Chevrolet dealer, under the circumstances hereinafter related.
For a period of approximately ten years prior to April 9, 1960, Trumbull had been selling new Chevrolet automobiles on a cash basis to Garner, a non-franchised Tennessee dealer. Several hundred cars thus passed hands. During that entire period one Bert Walker, a person domiciled in Detroit, Michigan, acted as Garner's agent in those transactions. The customary procedure was that Walker, as Garner's agent, would place the order and request Trumbull to have Michigan non-resident titles thereto issued in the name of specified purchasers from Garner. A check signed by Walker as Garner's agent would be given in payment of the full purchase price and the automobiles would then be delivered to Garner's employees at Trumbull's place of business in Detroit, but no title papers on the automobiles would be given to Garner or his employees at that time. Following such delivery Trumbull would obtain from the manufacturer a document known as a "Statement of Origin" covering the automobiles sold and forward same to the state of Michigan's title office for issuance of a temporary non-resident title certificate in the name of the person designated by Garner. When the title certificates were received and the Statements of Origin returned, the latter would be assigned by Trumbull to the person designated by Garner and these documents would then be forwarded to Garner. These documents were never available, however, for delivery to Garner until the check to Trumbull in payment for the automobiles had been honored by the bank on which drawn and prior to the events giving rise to this suit there had been no difficulty between Trumbull and Garner or his agent in connection with these transactions. The mentioned "Statement of Origin" is a document issued by the manufacturer reflecting on its face that a certain motor vehicle manufactured by it has been delivered to a certain dealer. On the reverse side are assignment blanks for successive transfers, originating with that dealer. The manu facturer of Chevrolet automobiles does not furnish such document unless the original dealer to whom the automobile is delivered is located in a state which requires such document to be presented as a condition preliminary to registration or issuance of title certificate upon such automobile. However, if the automobile is transferred by a franchised dealer in a state where no such requirement exists to a purchaser in a state where such requirement does exist, the *832 manufacturer will, solely upon the request of the original dealer, furnish the Statement of Origin to him. It is admitted that in those states which do not require the presentation of such documents as a condition to the registration of titling of an automobile, they are nevertheless usable as evidence of ownership.
The stipulation defines a temporary nonresident Michigan title certificate as one issued by the Secretary of State of Michigan upon receipt of a bill of sale and application from a non-resident purchaser. It is non-transferable and, together with the Statement of Origin, must be delivered to the title office of the state of destination of the vehicle for titling therein within 30 days from date of issue.

Facts Regarding Garner's Possession
On April 9, 1960, Garner telephoned by long distance from Tennessee to Trumbull's Detroit office, stated that his Michigan agent, Walker, was absent from Detroit for the weekend so that he was unable to contact him, and that he, Garner, wished to purchase eight new Chevrolet automobiles from Trumbull of the total value of $18,482.13; requested Trumbull to have the automobiles titled in Michigan in the name of Joseph L. Durrance, d/b/a Hertz Rent a Car System of Jackson, Tennessee, and represented that his agent, Walker, immediately upon return to the city of Detroit would deliver to Trumbull a "bona fide check" for the purchase price. Relying thereon Trumbull forthwith delivered to Garner's employees eight new Chevrolet automobiles, one being the vehicle involved in this suit, presumably for removal to the state of Tennessee by a truck transport on which they were loaded.
Three days later Garner's agent delivered to Trumbull a check to its order for the purchase price of the automobiles, which check, drawn on People's Bank of Dresden, Tennessee, was deposited to Trumbull's account in a Detroit bank for collection. Payment was declined and notice of protest received by Trumbull on April 26, 1960. On the following day Trumbull filed suit in Michigan to restrain the Michigan Secretary of State from issuing title certificates to said automobiles and that court on April 27, 1960, issued a temporary restraining order to that effect, which order remained in force when this suit was instituted in Florida. Trumbull has received no consideration whatever for any of said automobiles. There was never delivered to Garner or his agent or employees any invoice, bill of sale, manufacturer's Statement of Origin, or other document indicating transfer of Trumbull's interest to any other person. The title certificates and Statements of Origin remain in Trumbull's hands.

Facts Regarding Possession by Florida Motor Company of Pensacola
Possession of the automobile in suit was transferred from Garner by delivery at Pensacola, Florida, to Florida Motor Company of Pensacola, a partnership doing a used car business at Pensacola, Florida, pursuant to a purported purchase and sale. It appears that each of the partners was personally acquainted with Garner who for some years had been selling new cars to a Pensacola concern with whom the partners had been connected prior to February of 1960, and who had been regularly selling new cars to the partnership since its formation in February of 1960. The customary procedure that had been followed by the partnership in purchasing from Garner was that a member of the partnership would telephone Garner and place the order; several days later delivery would be made by Garner to the partnership in Pensacola in exchange for its check to Garner's order for the purchase price. The automobiles would be accompanied by a paper entitled "Car Invoice" made out on the letterhead of the Tennessee concern and signed by Garner personally under his trade name. Such document would state the selling price and description of the vehicles.
*833 About March 15, 1960, the partnership began having difficulty obtaining from the Florida Motor Vehicle Commission title certificates to automobiles purchased from Garner in those cases where the applications for title were not accompanied by the manufacturer's Statements of Origin. The partnership thereafter made it a practice when ordering automobiles from Garner to request that he send the Statement of Origin with the car, which was done in some instances but not in others.
The automobiles so purchased were bought as new cars which had not been previously titled or registered in any state, and it was the object of the partnership to obtain from Garner all papers and documents necessary for titling the automobiles in Florida as new cars. However, the Florida Motor Vehicle Commissioner required a notarized bill of sale from a franchised dealer to be submitted as evidence of ownership for new cars as a condition for titling in Florida, and as a condition for titling secondhand cars required, as evidence of ownership, that a title certificate be submitted if the automobile was from a state issuing title certificates or a certificate of registration if from a state requiring registration only.
The stipulation reflects that immediately prior to the formation of the partnership in February 1960 the members were connected with another Pensacola concern that frequently purchased automobiles from Garner, and had dealt with the Florida Motor Vehicle Commissioner upon the subject of the evidence of ownership necessary for titling in Florida of automobiles purchased from Garner; and that although at first title certificates were issued on the basis of a notarized bill of sale from Garner, the Commissioner, upon learning that the Garner concern was not a franchised dealer, thereafter required the submission of duly assigned Statements of Origin and notarized bills of sale as a condition to titling; and that this was the procedure being followed at the time this suit was filed.
It was the practice of the Pensacola partnership not to apply for Florida title certificates in its name at the time it received delivery of the automobiles from Garner. When a sale was made it would cause the purchaser to file an application with the Florida Motor Vehicle Commission for initial issuance of title certificate on the automobile. The partnership would execute the dealer's certificate at the bottom of the application for title certificate and would provide and attach to the application the duly assigned manufacturer's Statement of Origin, the partnership's invoice covering the sale, and an unsigned bill of sale from the partnership to the purchaser.
On or about April 11, 1960, a member of the partnership phoned Garner in Dresden, Tennessee, and placed an order for four new Chevrolet automobiles which were delivered to the partnership in Pensacola by Garner's employees on April 13, 1960. Among them was the automobile in suit and attached thereto was the manufacturer's window sticker placed thereon pursuant to the requirements of Public Law 85-506, 85th Congress, 15 U.S.C.A. § 1231 et seq., reflecting the delivery thereof to Trumbull as the dealer and other data, including an identification number of the vehicle and the manufacturer's suggested retail price. There was no license plate thereon.
Upon receiving delivery the partnership delivered its check to Garner's agent for the purchase price of the automobile and the same, upon being deposited for collection by Garner in Tennessee, was duly honored by the bank upon which drawn.
At the time the automobile was delivered to the partnership there was also delivered a document purporting to be a "Car Invoice", which prima facie reflected a sale by O.K. Motor Co. of Dresden, Tennessee (Garner's trade name) to the partnership, of the automobile in suit. This document is purportedly signed by Garner on behalf of his firm but is not notarized. At that *834 time or on a later date another document, purporting to be a "Duplicate Manufacturer's Statement of Origin" covering the automobile, was received by the Florida partnership from Garner. It describes the motor vehicle in suit on its face, and indicates that it was transferred by the manufacturer to Trumbull on February 16, 1960. On the reverse side of this one-page document is a purported assignment of the automobile from Trumbull to O.K. Motor Co., Inc., and a second assignment from that concern, acting by Boots Garner, to the Pensacola partnership. It is admitted that this document is not genuine, that it was neither issued by the manufacturer nor assigned by Trumbull, and that neither of them had any knowledge of its existence.

Subsequent Transactions
The automobile was placed on the partnership's Pensacola lot and offered for sale. During the week beginning April 18, 1960, the partnership attempted to get in touch with Garner for the purpose of ordering additional new automobiles but was unable to do so. Five days later, however, it learned that Garner was in bankruptcy and being apprehensive that such might affect the automobiles on hand that were obtained from him, undertook forthwith to have them titled in the name of the partnership. Accordingly, two days later it obtained from Mobile County, Alabama, an Alabama motor vehicle registration and tag receipt in its name for the automobile in suit. A fictitious address for the partnership appears on the Alabama registration and tag receipt.
On or about April 28, 1960, Trumbull conferred by phone with the Florida Motor Vehicle Commission, advising its representative of the circumstances surrounding the delivery of the cars to Garner and stating its desire to recover possession because they had not been paid for; also advising that Trumbull had retained the genuine manufacturer's Statement of Origin in its possession and had not given Garner any papers whatever evidencing ownership. This conversation was confirmed by letter of Trumbull to the Commission dated April 29, 1960.
Meanwhile, on April 23, 1960, two days before procuring the Alabama papers, the Pensacola partnership entered into a conditional sales contract with the appellee, Seawright, for the sale to him of the automobile in suit. The purchase price was $2,855 plus financing and other charges, of which $46.05 was paid in cash and the balance made payable in monthly installments. No deferred payments had been made when this suit was filed. The automobile was delivered to Seawright on that date and remained in his possession until it was seized by the sheriff under the writ of replevin herein. It was later returned to Seawright upon his posting a forthcoming bond. When he purchased and received delivery of the automobile the manufacturer's window sticker, hereinabove referred to, was still on the window of the car. The Pensacola partnership cooperated with Seawright in having him, on April 23, 1960, file in the Pensacola tag office of the Florida Motor Vehicle Commission an application for an original Florida certificate of title on the automobile. The application was forwarded to the central office of the Commission at Tallahassee and was received there on May 8, 1960. Shortly thereafter the Commission advised Trumbull of the filing of the application and thereupon Trumbull instituted suit in Florida against the Florida Motor Vehicle Commissioner to enjoin the issuance of the title certificate, and sought a temporary restraining order in the premises. The trial court denied the relief sought and ordered the Commission to issue the certificate, which was done. This order forms the subject of a separate appeal to this court.
In entering judgment the trial court found, inter alia, that the original transaction was one in which Trumbull "extended credit to the said Brooks Garner * * * and not a cash transaction," and that Trumbull is estopped by its conduct to claim a title superior to that of Seawright. Since *835 these conclusions are based entirely upon the stipulated facts, which are clear and unequivocal, this court stands on an equal footing with the trial court in applying the law thereto, and is not confronted with any question of usurping the well-established prerogative of a jury, or of a judge when sitting as a trier of fact, to pass upon the credibility of witnesses and of reconciling evidence that is conflicting in character. Our concern is simply to determine whether the trial court properly applied the law to the stipulated facts.
The sole question for determination is whether or not the appellant, Trumbull, under the admitted facts, was estopped from asserting superior title to the automobile as against the appellee, Seawright, who acquired possession from Florida Motor Company of Pensacola, who acquired possession from Garner, it being conceded that at the time possession was acquired by appellee and his predecessor neither of them had actual notice of appellant's claim.
To properly evaluate the question of estoppel, it is first necessary to determine whether the transaction between Trumbull and Garner constituted a sale of the automobile for cash or on credit. It is elemental that if a cash sale was consummated, the right of replevin does not exist. Appellant contends, in part, that the transaction between Trumbull and Garner could not have resulted in a sale because a person designated by Garner, rather than Garner himself, was to receive title to the automobile. The stipulation herein admits no conclusion other than an attempt on Trumbull's part to sell and on Garner's part to buy the subject automobile. It recites that it was the business practice of Trumbull to procure the temporary non-resident titles "for Garner's benefit" and in the name of such person as Garner designated. This did not change the essential character of the uncompleted transaction as one between Trumbull as seller and Garner as purchaser. It is equally clear that as between Trumbull and Garner the contemplated sale and purchase of the automobile was never consummated.
The temporary postponement of delivery of the purchase check under the circumstances hereinabove related was for Garner's convenience only and did not result in a sale on credit in contemplation of law; nor did delivery of the automobiles to Garner under the circumstances related modify the essential cash character of the transaction. Delivery under such circumstances operated to constitute Garner a bailee of the property, with an implied duty to return the vehicle to Trumbull in the even he, Garner, failed to perform his obligation under the attendant conditional sales agreement that for consummation depended upon the actual receipt by Trumbull of the check covering the purchase price and payment in due course when presented at the bank on which it was drawn. The contract being executory, it is well settled that title does not pass until consummation of the transaction and performance of the terms and conditions. 46 Am.Jur., Sales, Sec. 412.
Of course, the question of whether a substantial delay in presenting a check given for the purchase of personal property, as a matter of law, amounts to a waiver, or affords conclusive proof of a waiver of the seller's right to reclaim the article sold, is one which must be determined upon principles entirely different from those involved under circumstances where the rights of innocent purchasers have intervened. Such intervening rights present the question of equitable estoppel, and delay becomes important as tending to defeat or prejudice those rights. Equitable considerations, however, are not involved in determining the status of the original parties to the transaction, for there the question is one of evidence and delay is important only as tending to show whether or not there was an intention that title should pass before delivery of the check and payment upon due presentment.
In People's State Bank of Michigan v. Brown, 1909, 80 Kan. 520, 103 P. 102, 23 L.R.A.,N.S., 824, it was recognized that delivery and payment of a check, as a practical *836 matter, cannot be simultaneous; and it was there held that a delay of between two and three weeks in presenting a check given for the purchase price of articles to be paid for in cash did not, as a matter of law, defeat the right of the seller to reclaim the articles sold from attaching creditor.
The rule of law evolving from situations where a bad check has been given for the purchase price of goods, both from the standpoint of the immediate parties and of creditors and innocent purchasers for value, is stated as follows in 46 Am.Jur., Sales Sec. 447:
"Upon a sale of personalty for cash, payment is generally a condition of the passing of title and when the buyer gives a check or draft for the purchase price, and it is accepted by the seller as a means of payment, it constitutes only a conditional payment, and as between the parties payment becomes absolute only when the paper is paid, and until such payment title does not pass."
Mr. Justice Roberts, speaking for the Florida Supreme Court in Ragg v. Hurd, 1952, 60 So.2d 673, quoted with approval the first portion of the above rule.
Vold on Sales, page 174, summarizes the rule as follows:
"Payment by check is without special agreement commonly regarded only as conditional payment until cash. Following this analysis it is held by the great weight of American authority that delivering the goods to the buyer and taking his check for the price is not a waiver of the condition of payment in cash but that the property passes when the check is cashed. If, then, the check is dishonored on presentation, as for instance where it was forged or where the drawer had no funds, it is held that the goods still belong to the seller unless the seller is shown to have accepted the check in absolute payment, and that he can recover them from subsequent purchasers from the buyer even when they are purchasers in good faith for value without notice." (Emphasis supplied.)
Although the contemplated sale from Trumbull to Garner was on a cash basis, that sale was never consummated because the contract was executory to the extent that it was Garner's obligation to furnish Trumbull with a valid check covering the purchase price and one that would be honored upon presentment for payment. Since this was not done, there simply was no sale at all and any doubt about it is resolved by the fact that Trumbull never parted with possession of the manufacturer's Statement of Origin or the Michigan temporary nonresident title certificate, and never delivered to Garner or any other person any instrument whatever evidencing transfer of title. Indeed, Trumbull's practice in this instance was no different from that followed over many years of dealing with Garner during which it was customary to withhold all title documents until checks given for the purchase price had been honored.
The trial judge's erroneous finding that the transactions between Trumbull and Garner constituted a sale for cash unquestionably influenced his conclusion that Trumbull was estopped to claim a superior title to that of Seawright, the defendant in possession. A careful review of the stipulation herein clearly discloses that the sole factual basis for working an estoppel against Trumbull is that possession of the automobile was delivered to Garner. As Garner had no other indicia of title and since his successors in possession had no actual knowledge of his transactions with Trumbull, the effect of the lower court's holding is to elevate possession from "nine" to "ten points in the law." This is not so under the common law or under the statutes governing sales of motor vehicles.
Proceeding then, as we must, on the premise that Trumbull's right to possession is only inferior to that of an innocent purchaser for value, our next concern is *837 to determine whether possession of a secondhand, albeit new, motor vehicle in the hands of a licensed Florida automobile dealer, but one who is not a franchised dealer of the manufacturer, as was true of the Pensacola concern who sold to Seawright, is sufficient indicia of ownership and power to transfer a title such as will constitute his vendee an innocent purchaser for value as against the holder of legal title who parted with possession under the circumstances peculiar to this case. That question must be answered in the negative.
Motor vehicles constitute a special class of personalty which, because of considerations too numerous to recite, has had thrown up around transactions for the sale thereof and transfer of title thereto a distinct body of case and statutory law differing in many important respects from that generally governing sales of other types of personalty. And although it varies to some extent in the several states, the underlying trend and objective is to protect the interest and title of the rightful owner against fraudulent sales of such property, to establish a uniform method of transfer, and to insure, as far as practicable, the validity of title and possessory rights of the ultimate owner. To accomplish this, certain duties and limitations have been placed on the purchaser as well as the seller, and courts generally require strict compliance therewith. Thus, in the unreported case of Allen v. Universal C.I.T. Credit Corporation, 133 So.2d 442 (being case No. C-108 of the serial numbers of this court, opinion filed September 12, 1961), this court, speaking through Carroll, C.J., in passing on a purported sales contract executed in the state of Missouri, held that under the law of that state the failure of the purchaser to require the seller to furnish him with a title certificate at the time of the transaction rendered the contract void, even though the automobile was actually delivered to him incident to such attempted sale, and therefore deprived him of the right to maintain an action in this state against a third party for conversion thereof.
Statutory provisions governing the transfer of title to or protection of liens or other interests in motor vehicles are of fundamental importance in determining the status of a purchaser who relies exclusively upon the possession of the seller as a basis for title. The protection afforded an innocent purchaser relying upon the seller's possession is based upon estoppel, or more particularly the rule that where one of two innocent persons must suffer from the wrongful acts of a third, he who made the wrongful act possible must bear the loss. It follows that no estoppel will arise where the lawful owner is free from fault or where the purchaser is himself at fault because of failure to comply with the law governing the transaction, or because notice of irregularities in the seller's title is imputed to him by operation of statutory law or from the surrounding circumstances.
In the great majority of the cases in which the issue of estoppel has been successfully raised, the "innocent purchaser" has relied upon possession of the title documents in addition to possession of the vehicle itself. In situations where the original seller takes a check in payment and delivers the motor vehicle and certificate of title to a purchaser who transfers it to an innocent purchaser for value before the original seller learns that the payment check is dishonored, it is generally held that the innocent purchaser, relying upon the possession of the vehicle and the certificate of title in the hands of his seller, will be protected against the claims of the original seller; but that factual situation is readily distinguished from the case on review in which no title documents passed from Trumbull.
Chapter 23658, Laws of Florida 1947, was the first comprehensive act relating to the sale of motor vehicles in Florida and the preservation of liens and encumbrances thereon. The sale or purchase of motor vehicles in Florida is inhibited thereby unless in accordance with its provisions, and it limits the rights and modifies the common-law status of one who purchases a motor vehicle without requiring compliance *838 with such provisions. Amendments thereto and other pertinent laws upon the subject are codified in Chapter 319, Florida Statutes 1959, F.S.A., the applicable provisions of which will now be considered.
Section 319.21 F.S. 1959, F.S.A., provides:
"Necessity of certificate of title.  No person hereafter shall sell or otherwise dispose of a motor vehicle without delivering to the purchaser or transferee thereof a certificate of title with such assignment thereon as may be necessary to show title in the purchaser, nor purchase, or otherwise acquire, or bring into this state a motor vehicle, except for temporary use, unless such persons shall obtain a certificate of title for same in his, her or its name in accordance with the provisions of this law; provided that any dealer holding current dealer license plates issued by this state may, in lieu of having a certificate of title issued in the name of such dealer, reassign any existing certificate of title issued in this state or, if no certificate of title exists on such motor vehicles in this state, such dealer shall, over his signature, briefly note such fact of nonexistence and show the name and address of the party from whom the vehicle was obtained, on the face of the separate application for initial certificate of title which is made by the purchaser or transferee. * * *" (Emphasis supplied.)
It will be noted that this section applies to both the seller and the purchaser; also, that the exceptions to the requirement that a certificate of title be obtained as an incident to the purchase of a motor vehicle apply alike to a purchase by a "used car dealer", which term is synonymous with a "secondhand dealer", and a purchase by the ultimate user. However, the statutory exceptions to the requirement that the duly assigned certificate of title accompany the delivery of a motor vehicle to the purchaser or transferee is inapplicable to the case on review because the stipulation of facts herein fails to reflect that any effort was made to bring the transaction between Florida Motor Company of Pensacola, as seller, and the appellee, Seawright, as purchaser and ultimate user, within the framework of such exceptions.
The judgment on review contains a finding that the subject automobile was sold by Trumbull to Garner as "a new automobile" and sold by Garner to the Pensacola concern as "a new automobile". While it may be true that the automobile in suit was "a new automobile" in the sense that it had not been regularly put to the use for which designed, both Garner and Florida Motor Company of Pensacola were "used car dealers" within the meaning of Section 320.272 F.S. 1959, F.S.A., and were dealing with a "secondhand" motor vehicle as that term is commonly understood within the parlance of the trade and as clearly defined by the statute, viz.:

"`Used motor vehicle' means every motor vehicle, title to, or possession of, which has been transferred from the person who first acquired it from the manufacturer, distributor, or dealer or which has been registered or is commonly known as secondhand within the ordinary meaning thereof." (Emphasis supplied.)
The following definitions are also contained in said section of the statutes:

"`New motor vehicle' means a motor vehicle, the equitable or legal title to which has never been transferred by a manufacturer, distributor or dealer to an ultimate purchaser.

"`Ultimate purchaser' means, with respect to any new motor vehicle, the first person, other than a dealer purchasing in his capacity as a dealer, who in good faith purchases such new motor vehicle for purposes other than resale." (Emphasis supplied.)
It is interesting to note that a special occupational license and other requisites are *839 provided for "secondhand dealers". See Section 320.27 F.S. 1959, F.S.A.
Section 319.22(1) F.S. 1959, F.S.A. provides:
"Except as provided in §§ 319.21 * * *, no person acquiring a motor vehicle from the owner thereof, whether such owner be a dealer or otherwise, hereafter shall acquire a marketable title in or to said motor vehicle until he, she, or it shall have had issued to him, her or it a certificate of title to said motor vehicle; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title or an assignment of such certificate for said motor vehicle for a valuable consideration. * * *"
Since Trumbull, the franchised dealer and owner, never surrendered or assigned to anyone the manufacturer's Statement of Origin that was delivered to it by the manufacturer and never gave to anyone any document evidencing transfer of title out of Trumbull, the interdict of the statute against working a waiver or estoppel in favor of the appellee appears conclusive. And this is true under the common law relating to sales, as well as under the statute.
As previously stated, at all times there was attached to the automobile the window sticker required by Public Law 85-506, 85th Congress, containing the data prescribed thereby. This constituted clear notice to the Pensacola concern and to Seawright, the appellee, that Trumbull of Detroit was a former owner of the secondhand car. That ownership could be ignored only at the peril of the purchaser.
Section 319.27(f) F.S. 1959, F.S.A., provides:
"(f) Any person, firm or corporation purchasing [an automobile] upon which no certificate of title has been issued in Florida shall be deemed to be an innocent purchaser for value, without notice, of any retain title contract, conditional bill of sale or chattel mortgage, provided such purchaser: 1. procures from the person selling such vehicle a sworn statement showing: a. that no lien does exist; b. name and address of owner on the date the current tag on such vehicle was acquired; c. county and state where current tag on such vehicle was acquired; 2. attaches to such sworn statement the certificate of title, if one has been issued. If a certificate of title has not been issued, procures from the seller an oath that no certificate of title has ever been issued, and 3. obtains a telegram or statement in writing from the motor vehicle commissioner, or like officer, in the state of the current tag, to the effect that no lien does exist on said motor vehicle. * * *" (Emphasis supplied.)
It is obvious that a purchaser who does not obtain the mentioned documents, as appellee failed to do in this case, is not "an innocent purchaser for value" as against the claim of a person holding legal title to or a lien upon the motor vehicle.
In McQueen v. M. & J. Finance Corp., Fla. 1952, 59 So.2d 49, 50, M. & J. Finance Corporation sued McQueen for damages on the theory that he had destroyed plaintiff's lien upon an automobile and had converted the security by selling it to a third person. Judgment was rendered for defendant and on appeal was affirmed. In that case one William E. Taylor, Jr., while owner mortgaged the automobile to the finance corporation to secure a loan. This was done in South Carolina where the mortgagor then lived and the mortgage was recorded in that state. Taylor brought the car to Florida and sold it to McQueen who, before completing the purchase, contacted the Motor Vehicle Commissioner of Florida and was told there were no liens of record there against the car. He then paid for the car and received from Taylor a bill of sale warranting it to be free of encumbrances, and a certificate of ownership issued by the *840 state of South Carolina. The same day McQueen sold the car to one William T. Robinson, Jr., but did not then deliver to him a certificate of title from the state of Florida. A few days later the finance corporation filed notice of its lien in the office of the Florida Motor Vehicle Commission.
The finance corporation then sued McQueen, Taylor and Robinson to foreclose its chattel mortgage. In that case the chancellor held that Robinson was a bona fide purchaser and denied relief without prejudice to the right of the finance corporation to proceed against McQueen for damages, and apparently there was no appeal. The finance corporation then brought the cited action against McQueen for conversion, to which McQueen pleaded the mentioned circumstances concerning his inquiry in Tallahassee and the absence of any information on the South Carolina title certificate concerning any lien. On the appeal McQueen also stressed the lateness of the recordation of the lien in this state. The Supreme Court, Thomas, J., held that F.S. Section 319.21, F.S.A. was enacted "to establish the necessity for certificates of title, generally," and that F.S. Section 319.22, F.S.A. was intended to apply in cases not regulated by that section, pointing out:
"It specifies that no person acquiring a motor vehicle from the owner shall get marketable title until he shall have issued to him a certificate of title; also, that no waiver or estoppel shall work in favor of such person against one having possession of the certificate of title, or an assignment of it for a valuable consideration. There follows this language: `Except as otherwise provided herein, no court * * * shall recognize the right, title, claim or interest of any person in or to any such motor vehicle, * * * sold * * * or mortgaged * * * unless evidenced by and on a certificate of title duly issued * * *.' The title to this section and its content indicate that it was designed to regulate transfer of title.
* * * * * *
"The appellant seems to have relied implicitly upon the representations of Taylor, without inquiring about the status of the title except from the office of the Florida Motor Vehicle Commissioner, although it was clear that Taylor had just removed from South Carolina to Florida.
* * * * * *
"Appellant was charged with knowledge of the provisions of Chapter 319, Florida Statutes 1949, and F.S.A. It would be unfeasible to detail the steps necessary in all situations to secure a certificate of title, but from a minute examination of the appropriate provisions we have concluded that he disregarded the requirements that were calculated to afford protection to all like him who purchase automobiles." (Emphasis supplied.)
To the same effect see Clinger v. Reliable Discount Company, Fla. 1955, 80 So.2d 606, 607, in which Mr. Justice Roberts, speaking for the Supreme Court, cited the McQueen case with approval and said that under Florida law failure to comply with F.S. § 319.27, F.S.A. deprives the purchaser of the right to plead that he is a subsequent purchaser for value, without notice, and that he cannot escape the penalty of his own carelessness. In Clinger it is also said:
"Whether it is said that defendants had `constructive' notice of the chattel mortgage recorded in Missouri covering the exact same car as was purchased by them, because it is imputed to them under the recording statutes, or whether it is said that the defendants had the `implied' notice which is `inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use,' First Federal Savings & Loan Ass'n of Miami v. Fisher, Fla. 1952, 60 So.2d 496, 499, is unimportant."
*841 In the recent case of Dicks v. Colonial Finance Corporation, Fla. 1956, 85 So.2d 874, the rule is reiterated that in the absence of some intervening principle of estoppel or waiver, no one can convey better title than he has, and conversely, in the absence of some such intervening right, one cannot claim a better title than he, in fact, receives, citing Glass v. Continental Guaranty Corporation, 81 Fla. 687, 88 So. 876, 25 A.L.R. 312; Commercial Credit Co. v. Neel, 91 Fla. 505, 107 So. 639. In Glass it is said [81 Fla. 687, 88 So. 879]:
"The mere possession of personal property is only prima facie evidence of title; and a purchaser of personal property from one who has only the possession of the property under an incomplete conditional sale cannot in general defeat a recovery by the true owner, although such purchaser bought for value and without notice. See Campbell Printing Press & Manuf'g Co. v. Walker, 22 Fla. 412, 1 South. 59; Fairbanks, Morse & Co. v. Eureka Co., 67 Ala. 109; Marvin Safe Co. v. Norton, 48 N.J.Law, 410, 7 Atl. 418, 57 Am.Rep. 566; Roof v. Chattanooga Wood Split Pulley Co., 36 Fla. 284, 18 South. 597; Lanier v. Chancy, 76 Fla. 443, 80 South. 312."
The case of Motor Credit Corporation v. Woolverton, Fla. 1957, 99 So.2d 286, relied on by appellee, was followed by the Second District Court of Appeal in Allen Parker Company v. Taylor, Fla.App., 1960, 120 So.2d 52, 55. In Woolverton, the Supreme Court, speaking through Mr. Justice Roberts, affirmed a declaratory decree in favor of the appellee, holding that she was an innocent purchaser for value of the motor vehicle involved in that suit. The court was sharply divided, four to three. However, in both the Woolverton and Taylor cases the automobile involved was consigned by the claimant to the dealer with express or implied authority to sell. These cases cite with approval the well-recognized rule, stated in Glass v. Continental Guaranty Corporation, supra, to the effect that where such a consignment occurs, or the property is delivered with indicia of ownership or of authority to sell, a purchaser who pays value therefor and takes possession without notice of the terms or conditions of the delivery, consignment or sale, obtains a good title as against the original owner, which would in general prevail against the latter's reserved title. That concept is inapplicable to the facts in the case on appeal. The decision in Woolverton turned on the premise that the facts in evidence before the chancellor warranted the conclusion that Motor Credit Corporation, the dealer's assignee of a conditional sales contract given to the dealer by a former purchaser of the automobile involved in that suit, expressly or impliedly consented to the resale by the dealer to Woolverton, which sale occurred after the dealer had repossessed it from the former purchaser. In the Taylor case a secondhand automobile dealer was permitted to retain possession of an automobile securing a lien in favor of Allen Parker Company, with the understanding that upon sale thereof the lien would be discharged. The dealer sold it prior to registration of the lien with the Florida Motor Vehicle Commission and defaulted in its obligation to the lienee, who then attempted to assert the lien against Taylor. In holding that Taylor's claim was superior the court said: "The dealer here was more than mortgagor in possession. He was agent for bringing about a sale."
In Vincent v. General Motors Acceptance Corporation, Fla. 1954, 75 So.2d 778, 781, the Supreme Court, speaking through Mr. Chief Justice Roberts, held that the purchaser of a motor vehicle is charged with knowledge of the provisions of Chapter 319 F.S., "so [that] he must know that the title of his vendor will be defective unless the requirements * * * have been met. * * * But if he relies on the representations of his vendor, and it turns out that his confidence has been misplaced, he cannot `escape the penalty for his own carelessness'."; *842 and quoted with approval the following excerpt from Motor Inv. Co. v. Breslauer, 64 Cal. App. 230, 221 P. 700, 703:
"It is not going too far to say and to hold that it is preferable and more desirable than an innocent purchaser or incumbrancer of personal property brought into a state under such circumstances as those characterizing the transaction with which we are here concerned should suffer loss, which possibly his own improvidence or want of diligence has brought to him, than that the state should assume and maintain an attitude towards such transaction which would necessarily stigmatize it as an accessory after the fact to the fraud inhering therein."
For the reasons stated we are of the opinion that the plaintiff-appellant, Trumbull, was entitled to prevail on its motion for summary judgment and that the trial court erred in entering the final summary judgment appealed.
The judgment appealed is vacated and this cause is remanded with directions to enter judgment for the plaintiff in replevin.
Reversed and remanded.
CARROLL, DONALD K., C.J., and WIGGINTON, J., concur.

On Petition for Rehearing
PER CURIAM.
The appellee, Seawright, by his petition for rehearing challenges the following sentence found in the main opinion:
"The trial judge's erroneous finding that the transactions between Trumbull and Garner constituted a sale for cash unquestionably influenced his conclusion that Trumbull was estopped to claim a superior title to that of Seawright, the defendant in possession." (Emphasis supplied.)
The challenge is based on the correct premise that the trial court held that the transaction between the appellant, Trumbull, and Boots Garner, doing business as O.K. Motors of Dresden, Tennessee, was not for cash but instead was one in which Trumbull extended credit to Garner. Our use of the word "cash" instead of "credit" in said sentence was a misprision. Accordingly, that word is stricken and the word "credit" substituted therefor. The court regrets this error. We suggest, however, that a casual reader of our main opinion should have no difficulty in concluding that the author committed a misprision in using the word "cash" rather than "credit" in the isolated paragraph taken out of context.
The petition for rehearing is denied.
CARROLL, DONALD K., C.J., and STURGIS and WIGGINTON, JJ., concur.